United States District Court
Southern District of Texas
**ENTERED**
April 23, 2020
David J. Bradley, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. 4:14-CR-00576 |
| | § | |
| RANDALE DESHAY JACKSON, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

Defendant Randale Deshay Jackson has moved for compassionate release, asking the Court for release from his remaining term of imprisonment pursuant to Title 18, United States Code, Section 3582(c)(1)(A)(i). Having fully considered the applicable law and the parties' positions, Defendant's motion is **GRANTED**.

### I.       Background

On March 6, 2018, this Court sentenced Mr. Jackson to 154 months imprisonment in the Bureau of Prisons ("BOP") for Aiding and Abetting Interference with Commerce by Robbery and Aiding and Abetting Using and Carrying a Firearm During and in Relation to a Crime of Violence. Mr. Jackson is currently incarcerated at the United States Medical Center for Federal Prisoners in Springfield, Missouri ("MCFP Springfield").

By the time of sentencing, Mr. Jackson was already suffering from end-stage kidney disease secondary to ANCA vasculitis, an autoimmune disease that affects the small vessels of the body, requiring dialysis three times per week. (Doc. No. 95, at 19). Mr. Jackson also suffers from hypertension, heart disease, and chronic lung disease. (Doc. No. 219-3, at 3; Doc. No. 219-1, at 127). He has a history of pneumonia, for which he has been hospitalized several times, including

1

in the intensive care unit, and he must use oxygen while sleeping and takes prednisone daily to treat shortness of breath. (Doc. No. 219-3, at 3).

Prior to sentencing, Mr. Jackson had begun evaluation for a kidney transplant (Doc. No. 95, at 19), and a doctor testified at his sentencing hearing that a kidney transplant is a medical necessity for Mr. Jackson (Doc. No. 223, at 15). Mr. Jackson expressed concerns prior to his sentencing about having his health needs adequately met while incarcerated. In response to those concerns, the Probation Office filed an addendum to its presentence report indicating that the BOP could meet Mr. Jackson's dialysis needs and suggesting that the BOP was open to providing Mr. Jackson a kidney transplant. (Doc. No. 163, at 1). The government also represented at the sentencing hearing that a transplant would be a possibility in BOP custody. (Doc. No. 223, at 15). The Court's sentencing decision was based on the assumption that a transplant would not be foreclosed to Mr. Jackson during his incarceration. *Id.* That assumption has proven to be false.

On August 28, 2019, Mr. Jackson wrote to the Court explaining that, according to a written BOP program statement protocol, "a person with my underlying auto-immune condition 'vasculitis' heart failure and oxygen dependant [sic] cannot receive a kidney transplant from the BOP." (Doc. No. 201, at 1). Mr. Jackson asked the Court for compassionate release to prevent what would otherwise be a "death sentence" absent a renal transplant. *Id.* at 2. On October 10, 2019, the Court reappointed defense counsel, Letitia D. Quinones, to assist Mr. Jackson with his request for compassionate release. (Doc. No. 203).

The Court held an initial hearing on the matter on October 28, 2019. At the hearing, defense counsel represented that Mr. Jackson's unit manager had confirmed, based on conversations with a BOP medical coordinator and transplant coordinator, that Mr. Jackson does not qualify for a kidney transplant under the BOP rules given his underlying conditions. (Doc. No. 223, at 2-3, 7).

2

The government has produced no evidence to the contrary. The Court requested more information regarding whether Mr. Jackson would be a candidate for a kidney transplant should he be released from prison. (Doc. No. 223, at 14). To meet the Court's request, defense counsel retained Dr. Kevin O. Griffiths to review Mr. Jackson's medical records and provide the Court with an expert opinion as to transplant candidacy. (Doc. No. 216). Dr. Griffiths is a board-certified nephrologist who routinely cares for 250 dialysis patients at Metro Renal Associates in Washington, DC and regularly "perform[s] transplant evaluations for patients who have chronic kidney disease and who are on dialysis and are awaiting a renal transplant." (Doc. No. 219-3, at 2).

Dr. Griffiths' completed his report on March 23, 2020. (Doc. No. 219-3). Dr. Griffiths' report confirms that Mr. Jackson suffers from ANCA vasculitis and end-stage kidney disease requiring dialysis. *Id.* at 2. The report also notes that Mr. Jackson suffers from hypertension and has "developed some chronic lung disease from the vasculitis." *Id.* at 3. Based on a review of Mr. Jackson's complete medical records from 2018 and 2019, Dr. Griffiths concludes that Mr. Jackson has been "a model dialysis patient," that his "labs and blood pressure are optimally controlled," and that his "cardiac function was noted to be normal." *Id.* at 2–3. Dr. Griffiths notes that Mr. Jackson, like many patients with end-stage kidney disease, has "significant comorbidities." *Id.* at 3. But Dr. Griffiths explains that none of Mr. Jackson's coexisting illnesses would preclude a kidney transplant if he were released. A transplant would be foreclosed only if Mr. Jackson had one of several "absolute contraindications," such as active infections, active malignancy, active substance abuse, reversible kidney failure, uncontrolled psychiatric disease, or documented active and ongoing treatment nonadherence. *Id.* (citing Ana P. Rossie et al., *Kidney Transplantation in Adults: Evaluation of the Potential Kidney Transplant Recipient*, UpToDate (Feb. 2020) (hereinafter "*Kidney Transplantation in Adults*")). "Mr. Jackson does not have any of these

3

absolute contraindications." *Id*. Dr. Griffiths thus concludes that, "if not incarcerated, Mr. Jackson would be a viable candidate for renal transplant pending a full pulmonology evaluation." *Id.* As for pulmonary health, Dr. Griffiths notes that the "severity of [Mr. Jackson's chronic lung disease] is unclear, but his pulmonology medical team has adjusted his medications to address this issue." *Id.* In short, Dr. Griffiths opines that, "from a renal perspective, [Mr. Jackson] is a viable candidate for transplantation." *Id.*

On April 6, 2020, defense counsel filed a renewed Motion for Compassionate Release, citing both Mr. Jackson's need for a kidney transplant and his high vulnerability to COVID-19. (Doc. No. 219). The Court held a hearing on the Motion on April 15, 2020 and took the matter under advisement. For the following reasons, the Court determines that compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) is appropriate in this case.

## II.     Analysis

Mr. Jackson moves for a reduction in sentence under 18 U.S.C. § 3582(c)(1)(A)(i), which permits the sentencing court to grant such a motion where "extraordinary and compelling reasons warrant such a reduction" and "a reduction [would be] consistent with applicable policy statements issued by the Sentencing Commission," following consideration of the factors set forth in 18 U.S.C. § 3553(a).

### i.     Exhaustion of Administrative Remedies

Section 3562(c)(1)(A) provides that the sentencing court may entertain a motion for sentence reduction if thirty days have elapsed since the warden of the institution in which the defendant is incarcerated received a request to bring such a motion on defendant's behalf. 18 U.S.C. § 3582(c)(1)(A). Mr. Jackson's unit manager has confirmed that, as of October 17, 2019,

thirty days had lapsed since the warden received Mr. Jackson's request. (Doc. No. 223, at 3, 12). Thus, Mr. Jackson has established administrative exhaustion.

### ii.    Extraordinary and Compelling Reasons

The applicable United States Sentencing Commission policy statement—which was issued before passage of the First Step Act and has not been amended since—enumerates three reasons that qualify as extraordinary and compelling. Mr. Jackson argues that reduction of his sentence is appropriate under the policy's "terminal illness" subsection, which provides that extraordinary and compelling reasons exist when:

> (A) **Medical Condition of the Defendant.—**
>
> (i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

U.S.S.G. § 1B1.13(1)(A), cmt. n.1(A). Mr. Jackson argues that his end-stage kidney disease qualifies as a "terminal illness."

In the alternative, Mr. Jackson argues that release is appropriate under the policy's catch-all provision, which gives the Director of the BOP the authority to determine whether "there exists in defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." *Id.* § 1B1.13(1)(A), cmt. n.1(D). Since passage of the First Step Act, courts have almost uniformly held that § 1B1.13(1)(D) grants them the same discretion in assessing extraordinary and compelling reasons. *See United States v. Almontes*, No. 3:05-cr-58, 2020 WL 1812713, at \*3 (D. Conn. Apr. 9, 2020) (collecting cases). In exercising that discretion, the policy's "prior interpretation of 'extraordinary and compelling' reasons is informative, but not dispositive." *United States v. Brown*, 411 F. Supp. 3d 446, 451 (S.D. Iowa

2019) (internal quotation omitted). Mr. Jackson has presented two reasons for a reduction in sentence under the catch-all provision: his inability to receive a medically necessary kidney transplant in prison and his particularly high risk of dying if he contracts COVID-19.

The first issue before the Court is whether Mr. Jackson's end-stage kidney disease qualifies as a terminal illness under subdivision (A). The Court understands that, at least as of Fall 2019, Mr. Jackson's life expectancy with dialysis was estimated to be greater than 18 months. Under subdivision (A), however, "a specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required." U.S.S.G. § 1B1.13(1)(A), cmt. n.1(A). The Court notes that end-stage organ disease is specifically listed as an example of a terminal illness in the policy statement. No one disputes that Mr. Jackson has been diagnosed with end-state kidney disease. The only remaining question is whether Mr. Jackson's diagnosis has "an end of life trajectory." *Id.* If Mr. Jackson is released from prison and obtains a renal transplant, the terminal trajectory of his disease may be diverted, at least for a while. But if Mr. Jackson remains in BOP custody, where a transplant is out of reach, his disease will be terminal. The Court determines that it is the in-custody trajectory of Mr. Jackson's disease that is relevant to its § 1B1.13(1)(A) "terminal illness" analysis. Mr. Jackson has therefore shown that he suffers from a terminal illness as required to establish extraordinary and compelling reasons under subdivision (A).

Alternatively, Mr. Jackson has also shown that his very serious medical conditions warrant a reduction of sentence under the catch-all provision of subdivision (D), especially in light of the current COVID-19 health crisis.

Even prior to the pandemic, the Court indicated it would likely find extraordinary and compelling reasons under the catch-all provision if Mr. Jackson could establish that he is ineligible for a transplant in BOP custody, but would be eligible if released. (Doc. No. 223, at 8). At the

April 15, 2020 hearing on this matter, the government did not challenge Mr. Jackson's claim that he is ineligible for a transplant under the BOP's transplant protocol. Instead, the government argued that Mr. Jackson would likely not be eligible even if released because he has a history of not complying with medical treatment.

The only evidence the government presented for its claim of noncompliance came in the form of an email it forwarded to the Court after the hearing. The email was originally sent from MCFP Medical Officer Dr. Katherine Lear to MCFP Attorney-Advisor Shane P. McCullough on October 31, 2019 in response to an inquiry from the government following the Court's initial hearing on this matter. In her email, Dr. Lear describes Mr. Jackson's "noncompliance" as consisting of "not showing up for appts., not taking meds as prescribed, fluid overload, etc."[1]

The Court finds that the 135 pages of medical records provided to the Court by Mr. Jackson's defense counsel do not substantiate a history of noncompliance. The only issues of noncompliance noted in Mr. Jackson's consultation notes—which were prepared by his treating nephrologist, Dr. David Sommerfeld—appear to involve management of his phosphorus levels. One note from 2018 indicates that Mr. Jackson's levels are high because he has been "adding flavor additives to his water." (Doc. No. 219-1, at 30). Another suggests that he has not been avoiding salty snacks. *Id.* at 49. A third states that Mr. Jackson "admits that he has been missing some [phosphate] binders." *Id.* at 42. These occasional slip-ups do not amount to the kind of "documented active and ongoing treatment nonadherence" that would bar transplantation. *See*

---

[1] As far as the Court understands, "fluid overflow" is a symptom that occurs in dialysis patients because their "kidneys are no longer able to keep the right balance of fluid in [the] body," and is managed in part by "limit[ing] how much sodium (salt) and fluid you have between dialysis treatments." *See Fluid Overload in a Dialysis Patient*, National Kidney Foundation, https://www.kidney.org/atoz/content/fluid-overload-dialysis-patient.

*Kidney Transplantation in Adults* at 4 (indicating that dialysis compliance is the primary concern and requiring that patients be "compliant with the dialysis treatment for at least one year before becoming active on the transplant list"). Mr. Jackson's medical records do not indicate that he has been inconsistent in attending dialysis or attending other appointments. In fact, based on those records, Dr. Griffiths describes Mr. Jackson as "a model dialysis patient." (Doc. No. 219-3, at 3). Moreover, Mr. Jackson's more recent medical records from 2019 contain no mention of any compliance issues whatsoever.

Accordingly, based on Dr. Griffiths' report, Mr. Jackson's medical records, the credible representations of defense counsel, and the lack of any substantive counter-evidence from the government, the Court finds that Mr. Jackson has made a sufficient showing that he is barred from receiving a transplant in BOP custody, but would be eligible if released, pending a full pulmonary examination. For Mr. Jackson, continued incarceration means being deprived of a chance to seek the "treatment of choice" for his end-stage kidney disease—a treatment that could not only improve his "quality of life," but reduce his "mortality risk." (Doc. No. 219-3, at 3).

The burdens of incarceration on Mr. Jackson's health are even greater since the onset of COVID-19. The Court is very aware that individuals like Mr. Jackson who have serious underlying medical conditions are at great risk during the pandemic. According to the Center for Disease Control ("CDC"), individuals with chronic lung disease, serious heart conditions, and chronic kidney disease are at higher risk of severe illness or death from COVID-19. *See* CDC, *Groups at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html. Mr. Jackson suffers from all three conditions. Indeed, all parties agreed at the April 15th hearing that Mr. Jackson will likely die if he contracts COVID-19.

The Court is also very aware that prisons are particularly conducive to the spread of COVID-19. *See, e.g,* Timothy Williams et al., *Jails Are Petri Dishes': Inmates Freed as the Virus Spreads Behind Bars*, N.Y. Times (March 31, 2020) https://www.nytimes.com/2020/03/30/us/coronavirus-prisons-jails.html. The government argues that the risk to Mr. Jackson is minimal because there is so far no confirmed case of COVID-19 at MCFP Springfield and the facility has been implementing protection protocols. But BOP prisons across the country have been instituting such protocols and, as of the issuance of this order, there are 566 federal inmates and 342 BOP staff who have confirmed positive COVID-19 test results, with 24 federal inmate deaths thus far. At this rate, it is not safe to assume that COVID-19 will not enter MCFP Springfield. When it does, Mr. Jackson will face a substantially heightened risk of serious illness or death.

The Court finds that Mr. Jackson's end-stage kidney disease, his need for a transplant for which he is ineligible in BOP custody, but could be eligible for if released, and his high vulnerability to COVID-19 amount to extraordinary and compelling reasons for reducing his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).

### iii.    Safety of Other Persons

Even if "extraordinary and compelling reasons" for early release exist, the relevant policy statements provide for a reduction in sentence only if a defendant "is not a danger to the safety of any other person or the community, as provided in 18 U.S.C. §3142(g)." U.S.S.G. §1B1.13(2). Factors relevant to this inquiry include: (1) the nature and circumstances of the offenses of conviction, including whether the offense is a crime of violence, or involves a minor victim, a controlled substance, or a firearm, explosive, or destructive device; (2) the weight of the evidence; (3) the defendant's history and characteristics; and (4) the nature and seriousness of the danger to

any person or the community that would be posed by the defendant's release. *See* 18 U.S.C. § 3142(g).

Because the government never filed a formal response to either Mr. Jackson's original or renewed motions for compassionate release, it remains unclear to the Court on precisely which ground(s) the government opposes a reduction of his sentence. Nonetheless, the Court will here conduct an independent inquiry into Mr. Jackson's dangerousness, as required by §1B1.13(2).

The Court recognizes the seriousness of Mr. Jackson's 2014 crime of conviction, which involved the robbery of a pharmacy with the use of a handgun. (Doc. No. 95, at 4-5). The Court also acknowledges that on September 25, 2017, while out on bond for that crime, Mr. Jackson was arrested for burglary of a vehicle, after which he remained in the custody of the Harris County Sheriff's office until sentencing. (Doc. No. 175). The Court further notes that, as a teenager and into his mid-twenties, Mr. Jackson pleaded guilty to several other vehicle burglaries and two assaults on a girlfriend or family member, though the Court also notes that these particular crimes were committed before Mr. Jackson's health took a turn for the worse. (Doc. No. 95, at 11-13). These crimes are undoubtedly serious and the Court has wrestled with what they indicate about Defendant's current level of dangerousness.

In the end, however, the Court is persuaded that Mr. Jackson's rapidly deteriorating health greatly curbs his potential dangerousness. As another district court facing a similarly tricky decision expressed: "The Court expects that the terminal diagnosis . . . would have a positive, clarifying effect on [the defendant]. Whether that is so or not, the disease undoubtedly dilutes any danger [he] might otherwise pose." *United States v. Karr*, 6:17-cr-25, 2020 WL 774363, at *8 (E.D. Ky. Feb. 18, 2020). Moreover, the Court is persuaded that Mr. Jackson's clear commitment

10

to seeking a kidney transplant will provide a strong incentive to avoid conduct, criminal or otherwise, that might jeopardize his ability to receive one.

The Court is also encouraged by the release plan proposed in this case. As became clear at the Court's April 15th hearing, Mr. Jackson's father, Edward Russell, has agreed that his son can come live with him if released, and that he will make every effort to care for his son's medical needs. Mr. Russell was himself released from prison in March 2016 and has since maintained a steady job and place of residence in Houston, Texas. (Doc. No. 159, at 8). In fact, upon his own release from prison, Mr. Russell lived with Mr. Jackson for a period of time before Mr. Jackson's current incarceration. *Id.* During that time, Mr. Russell resumed care of his son, which came naturally to him since Mr. Russell had been his son's primary caretaker before he was incarcerated when Mr. Jackson was only twelve years old. *Id.* The Court has received several letters from family and friends attesting to the positive influence that Mr. Russell had over his son during that period. (Doc. No. 159-1). Mr. Russell has been employed at the same company since his release, has taken initial steps toward owning his own car lot, and has maintained a steady home environment. (Doc. No. 159, at 8). The fact that Mr. Jackson can be released to live in this steady home under the care of his father further mitigates concern about Mr. Jackson's dangerousness.

The Court finds that any lingering concerns can be addressed through tailored conditions of release. The Court determines that Mr. Jackson should be placed on home confinement for the first eighteen months of probation**,** and be subject during that period to whatever location monitoring services the Probation Office sees fit to impose. During this time of home confinement, Mr. Jackson may not leave his place of residence, except for medical appointments or as otherwise approved in advance by the Probation Office. Mr. Jackson may not receive visitors at the home

11

except for family members, clergy, medical providers, and legal counsel, unless otherwise approved by the Probation Office. All other conditions of supervised release apply as well.

Based upon Mr. Jackson's deteriorating health, the incentives created by his need for a kidney transplant, the available plan of release, and the conditions of release imposed, the Court finds that Mr. Jackson does not pose a danger to the safety of any other person or the community.

### iv.    Section 3553(a) Factors

The final criterion for a reduction in sentence requires the Court to consider whether a reduction is consistent with the applicable § 3553(a) factors. *See* 18 U.S.C. § 3582(c)(1)(A); U.S.S.G. § 1B1.13. The applicable statutory factors include, among others: the nature and circumstances of the offense; the defendant's history and characteristics; the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; the need to deter criminal conduct and protect the public from further crimes of the defendant; and the need to provide the defendant with, among other things, any needed medical treatment. 18 U.S.C. §§ 3553(a)(1)-(7).

The nature and circumstances of Mr. Jackson's offense are serious. The Court is sensitive to the need to provide adequate punishment and deterrence and promote respect for the law. Mr. Jackson's current release date is August 21, 2028, which means he has so far served one-third of his sentence. But, with the additional 18 months of home incarceration taken into consideration, Mr. Jackson will ultimately serve almost one half of his originally imposed sentence. The Court finds that, under present circumstances, the resulting six-year period of incarceration is sufficient, but not greater than necessary, to promote adequate deterrence and respect for the law. The Court also finds, for the reasons discussed above, that such a sentence suffices to protect the public.

All other factors clearly favor immediate release. Mr. Jackson's history and characteristics have changed since sentencing because his chronic diseases have progressed and his health further deteriorated. Under the Guidelines, an "extraordinary physical impairment," of the sort under which Mr. Jackson now suffers, "may be a reason to depart downward." U.S.S.G. § 5H1.4. This is especially true at the present moment because Mr. Jackson's serious health problems place him at high risk of serious illness or death from COVID-19, which is spreading through our nation's prisons like wildfire. Section 3553(a) also provides that a sentence should reflect a defendant's need for "medical care." 18 U.S.C. § 3553(a). Here, the Court has learned since sentencing that a much-needed kidney transplant is not available to Mr. Jackson while in BOP custody.

For all the above reasons, the Court finds that the § 3553(a) factors, as considered in the context of Mr. Jackson's case, warrant a reduction in his sentence.

## III.    CONCLUSION

Finding a reduction in sentence warranted, the Court **GRANTS** the Motion for Compassionate Release (Doc. No. 209) on the following terms:

1. The Court REDUCES the term of imprisonment imposed from 154 months to the time served effective Wednesday, April 29, 2020;

2. Thus, the BOP SHALL release Mr. Jackson on April 29, 2020; Mr. Jackson may self-quarantine for 14 days at home in Houston, Texas rather than in BOP custody.

3. The Government SHALL promptly transmit this Court's Order to the BOP; The BOP SHALL advise Mr. Jackson's physicians of his forthcoming release to arrange for necessary accommodations concerning his dialysis and treatment schedule;

4. Defense counsel SHALL advise Mr. Russell of his son's forthcoming release so he can

arrange safe transport to Houston, Texas and prepare for his son's medical needs.

5. Per 18 U.S.C. § 3582(c)(1)(A), the Court IMPOSES a supervised release term equivalent to the unserved portion of Mr. Jackson's original term of imprisonment. All conditions of supervision announced in the Court's Original Judgment (Doc. 186) apply;

6. The Court IMPOSES as a special condition of supervision that Mr. Jackson is restricted to his place or residence continuously, for a period of 18 months, under the conditions set forth in the order above and in the Court's Amended Judgment;

7. The Court sets a post-release telephonic hearing, to cover expectations, clarify release conditions, and discuss questions on mechanics, for Friday, May 1, 2020 at 11 am. The Court will issue a notice of setting with dial-in instructions.

     **IT IS SO ORDERED.**

     **SIGNED** at Houston, Texas on this the 23rd day of April, 2020.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE